UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SUSAN H. BALL | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 09 C 3668 |
| | ) |
| v. | ) Magistrate Judge |
| | ) Arlander Keys |
| | ) |
| STANDARD INSURANCE COMPANY and | ) |
| GROUP LONG TERM DISABILITY | ) |
| INSURANCE POLICY | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

The instant litigation was brought as a result of Standard
Insurance Company's (Standard) denial of Susan Ball's claim for
long-term disability benefits. After an unsuccessful appeal of
the decision, Ms. Ball sued Standard and the benefits plan, Group
Long Term Disability Insurance Policy (collectively "Standard"),
pursuant to § 502(a)(1)(B) of the Employee Retirement Income
Security Act (ERISA), 29 U.S.C. § 1132(a)(1)(B). She seeks an
order compelling Standard to pay her benefits. Presently before
the Court is Defendants' Motion *In Limine* for a Declaration of
the Standard of Review[1] and for a Protective Order. For the
reasons set forth below, Defendants' motion is granted.

---

[1] Plaintiff concedes that the plan at issue granted
Standard discretionary authority to make determinations regarding
benefits, and thus, the appropriate standard of review is the
arbitrary and capricious standard. *See Gutta v. Standard Select
Trust Ins. Plans*, 530 F.3d 614 (7th Cir. 2008). Consequently,
Defendants' arguments regarding this issue will not be addressed.

## Background

Ms. Susan Ball worked as a legal secretary at the law firm of Crisham & Kubes, Ltd. (Crisham); a flare-up of her rheumatoid arthritis caused her to stop working at the firm on January 4, 2008. (Def.'s App. STND 1451-00346, 00487). On January 8, her rheumatologist, Dr. Daniel J. Hirsen (Hirsen), advised that she not work on January 7 and January 8 because of her condition. (Def.'s App. STND 1451-00349). She was permitted to - and did - return to work without any restrictions on January 9. (Def.'s App. STND 1451-00349, 00509). After another flare-up, however, Dr. Hirsen again directed Ms. Ball to remain home from work, this time from January 10 until she was re-evaluated on January 21. (Def.'s App. STND 1451-00348). She was released to return to work on January 28 and worked four more days before being terminated on February 20. (Def.'s App. STND 1451-00347, 00487, 00503, 00507-08).

On March 24, 2008, Ms. Ball filed for long-term disability benefits. (Def.'s App. STND 1451-00487). She indicated that rheumatoid arthritis had rendered her disabled since January 7, 2008; specifically, she stated that "stiffness [and] swollen joints" and her inability to "sit or stand for periods of time" precluded her from working. (*Id.*) Her claim was denied on May 30, 2008, because she failed to submit sufficient medical documentation to demonstrate that she had remained disabled

throughout the benefit waiting period (BWP), which concluded in April 2008.[2] (Def.'s App. STND 1451-00452-54).

Ms. Ball filed a Charge of Discrimination against Crisham with the U.S. Equal Employment Opportunity Commission (EEOC) on November 19, 2008. (Def.'s App. STND 1451-00425). In it, she alleged that Crisham failed to provide reasonable accommodations and that she was discriminated against as a result of her disability. (*Id.*) A little over a month later, on December 23, 2008, Plaintiff appealed Standard's decision denying her claim; the denial was affirmed, however, on March 20, 2009. (Def.'s App. STND 1451-00362, 00411).

The relevant medical documentation, as well as the opinions of Standard's initial and secondary reviewers, follows.

## 1. Documentation Submitted by Ms. Ball

A. *Advocate Christ Medical Center*

On December 15, 2007, Ms. Ball had bilateral x-rays of her feet performed. (Def.'s App. STND 1451-00279). There was evidence of osteopenia as well as congestive changes in her left foot – characteristics suggestive of rheumatoid arthritis. (*Id.*) No changes were seen in her right foot. (*Id.*) Bilateral x-rays of her hands were also performed. (Def.'s App. STND 1451-00280).

---

[2] There are discrepancies within the record concerning the date on which the BWP ended. At least one document says April 10, while another says April 11, 2008. (*Compare* Def.'s App. STND 1451-00374 with Def.'s App. STND 1451-00454). This is of no consequence, however, to the Court's analysis.

3

They revealed a slight periarticular osteopenia, with no definite erosive changes present in the articular or periarticular space. (*Id.*)

Ms. Ball underwent a magnetic resonance imaging scan (MRI) of her brain on January 22, 2008. (Def.'s App. STND 1451-00144). For the most part, the results were normal, only showing evidence of a potential arachnoid cyst and chronic small vessel disease. (*Id.*) Another MRI brain scan was performed on January 27, 2008; it revealed an acute infarct present in the right pons that had not been seen on the previous MRI. (Def.'s App. STND 1451-00146). It also showed a benign right CP angle arachnoid cyst and mild cerebellar tonsillar ectopia suggestive of a Chiari cyst. (*Id.*)

On February 3, 2008, Plaintiff had a magnetic resonance angiogram (MRA) of her carotid arteries performed. (Def.'s App. STND 1451-00139). It revealed a clot located in the midportion of the left internal carotid artery. (*Id.*) The MRA of her head that she underwent on the same day showed an intralumenal clot within the mid left internal carotid artery. (Def.'s App. STND 1451-00139, 00140). And while bilateral anterior inferior cerebellar arteries were patent, bilateral posterior inferior cerebellar arteries were not seen. (Def.'s App. STND 1451-00140). On the following day, a computed tomographic angiogram (CTA) of Ms. Ball's neck was done. (Def.'s App. STND 1451-

4

00143). A fusiform aneurysm was seen; there was no evidence for dissection, thrombus, or vessel occlusion. (*Id.*)

Ms. Ball underwent a cerebral angiogram on February 8, 2008. (Def.'s App. STND 1451-00137). A fusiform aneurysmal dilation of the mid left ICA was seen; there was no evidence of acute dissection or clot within the lumen. (*Id.*) Consequently, the physician noted that no intervention was required at the time. (*Id.*) Further, the procedure showed normal posterior fossa circulation vertebral and basilar; there was no evidence of dissection, narrowing, or stenosis. (*Id.*) An echocardiogram was performed on February 23, 2008, the results of which were normal. (Def.'s App. STND 1451-00150). While there was no evidence of a cardioembolic source for cerebrovascular accident, it was recommended that Ms. Ball undergo a transesophageal echocardiogram (TEE). (*Id.*)

On August 26, 2008, Ms. Ball underwent a CTA of both her head and neck. (Def.'s App. STND 1451-00136). The results indicated the presence of a fusiform aneurysm of the mid to distal cervical segment of the left internal carotid artery and a mild fusiform aneurysm of the supraclinoid segment of the left internal carotid artery. (*Id.*) These results were compared to those obtained on February 4, 2008, and it was found that the findings remained unchanged. (*Id.*)

After complaining of what were believed to be anginal

symptoms, Ms. Ball was admitted to the hospital on September 9, 2008, for tests. (Def.'s App. STND 1451-00151). During her stay, she had a left heart catherization performed, as well as a coronary angiogram, and a left ventricular angiogram. (Def.'s App. STND 1451-00154). These tests revealed that Ms. Ball had significant coronary artery disease involving all major vessels; consequently, she was considered for bypass surgery of all cardiac vessels. (Id.) The following day, she had a carotid duplex ultrasound performed; there was no evidence of carotid stenosis. (Def.'s App. STND 1451-00134). On this same date, she underwent an x-ray of her cervical spine. (Def.'s App. STND 1451-00135).

During her stay, Dr. Kowalczyk noted that, though Ms. Ball suffers from symptomatic rheumatoid arthritis, it was stable as of September 9, 2008, the day of her examination. (Def.'s App. STND 1451-00151). Additionally, he stated that Ms. Ball's arthritis was symptomatic but not "terribly erosive with regards to her joints compared to other people with rheumatoid arthritis." (Def.'s App. STND 1451-00152-153). He opined that Plaintiff's significant coronary artery disease necessitated coronary artery bypass grafting (CABG). (Id.) She also had a left internal carotid aneurysm. (Id.) However, it was Dr. Kowalczyk's belief that it was stable. (Id.)

Plaintiff had chest x-rays done on September 12, 2008.

(Def.'s App. STND 1451-00127). The results were normal. (*Id.*)
An electrocardiogram also performed on this date was abnormal; it
indicated a possible inferior infarct. (Def.'s App. STND 1451-
00126). Ms. Ball also underwent a TEE on this date. (Def.'s
App. STND 1451-00128). It revealed no evidence of patent foramen
ovale. (*Id.*) Further, her ascending aorta was unremarkable, and
she exhibited good left ventricular function. (*Id.*) Plaintiff
then underwent a CABG x5; her diagnosis pre- and post surgery was
severe three-vessel coronary artery disease. (Def.'s App. STND
1451-000205). She was discharged on September 17, 2008.

On November 1, 2008, Ms. Ball complained of chest pain and,
as a result, underwent chest x-rays. (Def.'s App. STND 1451-
00125). The x-rays showed post CABG changes. (*Id.*) Further,
there was slight pulmonary vascular congestion and mild bilateral
pleural effusions. (*Id.*)

B.    *Dr. Anton J. Fakhouri*

Ms. Ball visited Dr. Anton J. Fakhouri, an orthopaedic
surgeon, on August 11, 2008, complaining of left hand paresthesia
and pain in the base of her left thumb. (Def.'s App. STND 1451-
00118). Dr. Fakhouri diagnosed her as having, *inter alia*, basal
joint arthritis in her left thumb and provided her with a
opponens splint for this condition. (*Id.*)

C.    *Dr. Daniel J. Hirsen*

On March 19, 2007, Plaintiff visited Dr. Daniel J. Hirsen

7

for a follow-up for her rheumatoid arthritis. (Def.'s App. STND 1451-00291). Despite receiving Remicade infusions and Methotrexate, she was experiencing generalized pain and morning stiffness. (*Id.*) Dr. Hirsen opined that Ms. Ball's symptoms resulted from active inflammation and a joint exam revealed mildly active joint inflammation in her hand. (*Id.*) He instructed her to continue her then current dose of Remicade (the maximum dose) and to increase the amount of Methotrexate. (*Id.*)

Ms. Ball's condition continued to worsen. On April 30, 2007, Dr. Hirsen opined that she was doing poorly with her rheumatoid arthritis. (Def.'s App. STND 1451-00289). Despite the use of Remicade and Methotrexate, she continued to experience pain and stiffness in her fingers and elsewhere, especially in her left ankle. (*Id.*) Dr. Hirsen stated that the clinical examination of Ms. Ball did not "look too bad," and noted mild active swelling in the joints of her hand and tenderness in her left ankle. (*Id.*) He recommended that she continue the Remicade and Methotrexate. (*Id.*)

Ms. Ball returned to Dr. Hirsen on January 21, 2008, and complained of pain in her right elbow, knee, foot, and buttock. (Def.'s App. STND 1451-00288). On March 13, 2008, Dr. Hirsen submitted an Attending Physician's Statement, indicating that Plaintiff had suffered from painful, swollen, and stiff joints as a result of rheumatoid arthritis since before April 17, 2001.

(Def.'s App. STND 1451-00350). Despite monthly Remicade treatments, Ms. Ball's symptoms had remained unchanged since their onset. (*Id.*) Dr. Hirsen opined that she could lift and carry 1-10 pounds in a work day and could sit, stand, walk, and alternately sit and stand for approximately one hour each day. (*Id.*) She could bend and stoop only occasionally. (*Id.*) It was Dr. Hirsen's belief that Ms. Ball should never return to work. (*Id.*)

Ms. Ball saw Dr. Hirsen again on March 24, 2008. (Def.'s App. STND 1451-00208). He noted that she had experienced a cerebrovascular accident (CVA) in January; she had been diagnosed with an acute infarct in her right pons. She was also subsequently diagnosed with an aneurysm in her left carotid artery. (*Id.*) Plaintiff informed him that she had missed one week of Methotrexate and was experiencing increased generalized joint pain. (*Id.*) On examination, there was no joint inflammation seen. (*Id.*) Overall, Dr. Hirsen opined that Plaintiff's clinical examination was good. (*Id.*) He instructed her to continue the Methotrexate and Remicade and also follow-up every three months. (*Id.*)

Ms. Ball visited Dr. Hirsen for a rheumatology evaluation on September 11, 2008. (Def.'s App. STND 1451-00203). During the exam, Dr. Hirsen evaluated her for active joint inflammation, but found no evidence of it. (*Id.*) He did, however, find nodules at

both elbows. (*Id.*) In his notes ddcumenting the visit, he indicated that he had treated Plaintiff's rheumatoid arthritis for several years and that it was well controlled with Remicade and Methotrexate. (*Id.*) She visited him again on September 25, 2008; at that time he noted that Ms. Ball was doing well following her CABG. (Def.'s App. STND 1451-00206). He stated that her rheumatoid arthritis was "under good control" with the Remicade infusions and Methotrexate. (*Id.*) A clinical examination looked "good" and failed to reveal evidence of any active inflammation. (*Id.*) Dr. Hirsen advised Plaintiff to continue with the Remicade and Methotrexate and to follow-up with him every three months. (*Id.*)

D.  *Dr. Arthur Itkin*

Ms. Ball visited Dr. Arthur Itkin, a neurologist, on January 29, 2008, complaining of vertigo. (Def.'s App. STND 1451-00254). After reviewing the results of her MRIs, Dr. Itkin stated that she has a pontine lesion; she also suffers from rheumatoid arthritis. (Def.'s App. STND 1451-00258). He recommended that Plaintiff undergo both intra and extracranial MRAs in addition to an electrocardiogram (EKG) and an echocardiogram. (Def.'s App. STND 1451-00258). He also believed that it would be beneficial if Ms. Ball was evaluated by an ear, nose, and throat physician and underwent audiology testing for her vertigo. (*Id.*)  On February 26, 2008, Dr. Itkin stated that he had seen Ms. Ball and

10

she appeared to be doing better, though she was occasionally suffering from paresthesias as a result of her headache medication. (Def.'s App. STND 1451-00148). She had a transthoracic echocardiogram performed; it was negative. (Id.) An angiogram that Plaintiff underwent was also negative, save for a diffuse aneurysm. (Id.) Dr. Itkin opined that the aneurysm was not clinically relevant, but suggested that it be followed. (Id.) He maintained that her "neurologic examination today [was] actually quite good." (Id.) In order to ensure that Ms. Ball had no valvular problems, Dr. Itkin planned to perform a TEE and check her anticardiolipin antibodies and lupus anticoagulant. (Id.)

   E.   *Dr. Joseph A. Kowalczyk*

On January 19, 2008, Ms. Ball visited Dr. Joseph A. Kowalczyk and complained of tinnitus and dizziness. (Def.'s App. STND 1451-00222). She stated that her arthritis was not bad at the time. (Id.) He assessed her as having hypertension, rheumatoid arthritis, and possibly vertigo, and suggested that she undergo an MRI of her brain. (Def.'s App. STND 1451-00223). She saw him again a week later, on January 25, 2008. (Def.'s App. STND 1451-00224). During that time, they discussed the MRI scan that she had undergone. (Id.) Dr. Kowalczyk again recommended that she undergo an MRI and also referred her to a neurologist. (Def.'s App. STND 1451-00225). He advised her to

follow-up in one week. (*Id.*) She continued to complain of dizziness, however, when she visited him again on February 4, 2008. (Def.'s App. STND 1451-00226). She had undergone an MRA and Dr. Kowalyczyk noted that she had suffered a stroke in her right pons and advised her to follow-up in one month. (*Id.*)

In a letter dated February 5, 2008, Dr. Kowalczyk stated that Ms. Ball had been under his care for an extended period; she had recently visited him, complaining of, *inter alia*, vertigo. (Def.'s App. STND 1451-00114). He indicated that, after she was referred for a battery of neurological tests, it was discovered that she had suffered a right-sided CVA of her brain and also a left-sided brain aneurysm. (*Id.*) She was treated, he noted, for both conditions. (*Id.*) Because of the resulting medical procedures that she had, Dr. Kowalczyk advised on February 15, 2008, that Ms. Ball was unable to work on February 5, 2008. (Def.'s App. STND 1451-00115). He released her to return to work on February 18. (*Id.*)

When Ms. Ball visited Dr. Kowalczyk on March 7, 2008, he assessed her as suffering from a stroke. (Def.'s App. STND 1451-00317). On November 1, 2008, she saw him for a coronary artery disease follow-up. (Def.'s App. STND 1451-00232). She stated that she had experienced back, side, and shoulder pain during the week. (*Id.*) The pain had improved as of the time of the visit. (*Id.*)

## 2. Reports Submitted by Standard

### A. Dr. Ronald Fraback

Dr. Ronald Fraback, a rheumatologist, provided an initial review of Ms. Ball's file after she filed her claim with Standard. After examining Ms. Ball's medical records, he stated that he believed that Ms. Ball initially ceased working because of her arthritis, but that it had improved as of late January. (Def.'s App. STND 1451-00237). He also noted that she had possibly suffered a stroke in late 2007 or early 2008, but indicated that she had no obvious neurologic abnormalities as of the end of February. (Id.) Though he found it reasonable that she was unable to work from the date that she ceased working until early February 2008, he found no evidence that either her arthritis or neurologic condition precluded her from working beyond that time. (Id.) Further, he maintained that he did not expect a significant change in her arthritis, though it is difficult to predict future neurologic conditions. (Id.)

### B. Dr. Dorothy Nicholson

Dr. Dorothy Nicholson, a board certified rheumatologist, is a medical consultant employed by Standard to review Ms. Ball's file after she filed her appeal. (Def.'s App. STND 1451-00063, 00071). After evaluating the medical data provided by Standard and verbal correspondence with Dr. Hirsen, she concluded on February 12, 2009, that the documentation supports Plaintiff's

contention that she suffers from rheumatoid arthritis. (Def.'s App. STND 1451-00068). Though there are no records regarding Ms. Ball's clinical condition on or about January 4, 2008, Dr. Nicholson stated that it was reasonable that she was unable to work during that time, given the severity of her arthritis and the level of therapy that she required. (*Id.*) However, because Ms. Ball was released by her doctor, following a flare of her arthritis, to return to work on January 28, 2008, it was Dr. Nicholson's belief that Ms. Ball was capable of sedentary work as of that date; she opined that sedentary work is appropriate for a person whose rheumatoid arthritis is well controlled. (*Id.*) Despite Dr. Hirsen's statements to the contrary, it was Dr. Nicholson's belief that Ms. Ball could continue to perform sedentary work as long as her rheumatoid arthritis was controlled and she experienced no flares. (Def.'s App. STND 1451-00064, 00069). She lacked documentation to opine on Plaintiff's condition as of April 11, 2008. (*Id.*) Finally, when asked whether there was a relationship between Ms. Ball's cardiac issues and her arthritis, Dr. Nicholson stated that "[t]here is a large body of literature documenting the increased incidence of coronary artery disease in individuals with rheumatoid arthritis." (*Id.*)

C. *Marcia Sanderman*

Ms. Marcia Sanderman, Standard's senior disability benefits

analyst, reviewed the medical records submitted by Ms. Ball. (Def.'s App. STND 1451-00441, 00458). She cited Plaintiff's rheumatoid arthritis, but opined that there was no evidence in the record to support Ms. Ball's claims that she remained disabled after February 2008. (Def.'s App. STND 1451-00458). She also stated that there was not sufficient documentation to allow disability based on a neurologic condition. (*Id.*) Because Ms. Ball was not disabled throughout the BWP and beyond, Ms. Sanderman, on May 30, 2008, recommended that her claim be denied. (*Id.*)

### D. Dr. Leonid Topper

Dr. Leonid Topper, a board certified neurologist, performed an independent file review of Ms. Ball's claims for her appeal; he based his conclusion on medical documentation provided by Standard as well as verbal correspondence with Dr. Itkin. (Def.'s App. STND 1451-00073, 00080). As an initial matter, he maintained on February 12, 2009, that neither Plaintiff's vertigo, nor her stroke was related to her aneurysm. (Def.'s App. STND 1451-00078). He stated that the medical record supported Plaintiff's claims that she suffered a right pontine stroke in January 2008. (Def.'s App. STND 1451-00079). Because the condition is asymptomatic, he indicated that there was no evidence of restrictions or limitations on Plaintiff. (*Id.*) He further maintained that the record contained no documentation of

any sequelae from Ms. Ball's January 2008 stroke (CVA); he cited Plaintiff's subsequent normal neurologic examinations. (*Id.*) Dr. Topper stated that the vertigo that Plaintiff experienced could potentially be related to "the transient ischemic attacks which preceded the infarct in the right pons." (*Id.*) There was no actual evidence, however, that after the infarct, she remained symptomatic. (*Id.*) He noted that, while a pontine stroke may cause significant motor deficits, there was no evidence in the record that Ms. Ball suffered from any. (*Id.*) Despite Plaintiff's complaints of vertigo, Dr. Topper concluded that Ms. Ball was capable of working full-time on both January 4, 2008 and April 11, 2008. (*Id.*) It was also his belief, based on Dr. Itkin's statements in support, that Ms. Ball's neurologic conditions would not preclude her from working. (Def.'s App. STND 1451-00080).

## Standard of Review

Generally, parties are entitled to nonprivileged discovery regarding any party's claim or defense. Fed. R. Civ. P. 26(b)(1). Notwithstanding this broad discovery mandate, the Federal Rules allow courts to issue protective orders limiting discovery in certain situations. Specifically, "the [C]ourt may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1). In order to establish "good

cause," a particular and specific demonstration of fact is
required, as opposed to stereotyped and conclusory statements.

## Discussion

Defendant argues that the Court's review here is limited to
the administrative record. Thus, Plaintiff is not entitled to
the extensive discovery she seeks. Plaintiff maintains that she
is, indeed, entitled to the conflicts discovery, as the factors
articulated in *Semien v. Life Ins. Co. of North America*, 436 F.3d
805 (7th Cir. 2006), which act to limit discovery to the
administrative record, were abrogated by the Supreme Court's
decision in *Met. Life Ins. Co. v. Glenn*, 128 S. Ct. 2343, 171 L.
Ed. 2d 299 (2008).

As an initial matter, the Court finds no basis by which to
conclude that the factors outlined in *Semien* are no longer good
law following the Supreme Court's ruling in *Glenn*. While there
appears to be a split within the circuit, every Illinois court
considering the issue to date has concluded that *Semien* continues
to govern. *See, e.g., Garvey v. Piper Rudnick LLP Long Term
Disability Ins. Plan*, 264 F.R.D. 394 (N.D. Ill. 2009); *Nash v.
Life Ins. Co. of North America*, No. 09 C 1357, 2009 U.S. Dist.
LEXIS 36285 (N.D. Ill. Apr. 29, 2009); *Huss v. IBM Medical &
Dental Plan*, No. 07 C 7028, 2009 U.S. Dist. LEXIS 22588 (N.D.
Ill. Mar. 20, 2009); *Marszalek v. Marszalek & Marszalek Plan*, No.
06 C 3558, 2008 U.S. Dist. LEXIS 75319 (N.D. Ill. Aug. 26, 2008).

17

Finding no reason to depart from this precedent, the Court follows suit and analyzes Ms. Ball's request for limited discovery under the two-part test articulated in *Semien*.

The Seventh Circuit has held that "discovery is normally disfavored in the ERISA context." *Semien*, 436 F.3d at 814. Consequently, when a plan administrator has discretionary authority to determine benefit eligibility, as is the case here, courts generally limit discovery to the administrative record. *Vallone v. CNA Fin. Corp.*, 375 F.3d 623, 629 (7th Cir. 2004). Where there are "exceptional circumstances," however, "limited discovery" is allowed. *Semien*, 436 F.3d at 814-815. In order to demonstrate that discovery is appropriate, Plaintiff must "identify a specific conflict of interest or instance of misconduct," and "make a prima facie showing that there is good cause to believe limited discovery will reveal a procedural defect in the plan administrator's determination." *Id.* at 815.

Plaintiff argues that limited discovery is appropriate because she has "identified conflicts which show that there is good cause to believe that limited discovery will reveal procedural defects and/or financial conflicts of interest which affected Defendants' determination." Specifically, she cites Dr. Fraback's admission regarding the ability of a treating physician to assess a patient's functional capacity, Standard's job description, and Dr. Leonid Topper's ability to opine on

Plaintiff's medical condition.  The Court addresses each argument in turn.

## 1.  **Dr. Ronald Fraback's Opinions**

Plaintiff argues that Dr. Fraback's deposition admission provides more than adequate grounds for this Court to allow limited discovery.  The Court is not convinced.

During a deposition of Dr. Fraback on March 16, 2007, in an unrelated case, the following exchange occurred:

Attorney:     Would you agree that a physician who longitudinally treats a patient over time is in a better position to assess that patient's functioning?

Dr. Fraback:  It depends somewhat on the diagnosis.  If the patient has a diagnosis with objective findings, such as rheumatoid arthritis, cancer, something where there is something objective, then, yes, someone who is seeing the patient longitudinally has an advantage.

Plaintiff contends that this "admission seems at odds with Standard's firm reliance on only medical file reviewers, rather than Ball's treating physicians who supported her disability."

As an initial matter, the Court notes that there is "no requirement that [an insurance plan] conduct its own physical examination of the [P]laintiff."  *Geiger v. Coordinated Youth & Human Servs.*, No. 07-CV-681-WDS-DGW, 2009 U.S. Dist. LEXIS 58104, at *11 (S.D. Ill. July 8, 2009).  Nor is there anything inherently wrong with a plan administrator's adoption of the opinions of its medical consultants though they did not actually

19

examine the claimants. *See Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 324-25 (7th Cir. 2007); *Davis v. Unum Life Ins. Co. of America*, 444 F.3d 569, 577 (7th Cir. 2006); *Geiger*, 2009 U.S. Dist. LEXIS 58104. Plaintiff seemingly intimates that this is improper and attempts to bolster her argument by contending that Dr. Fraback's opinion that she can work contradicts clear evidence presented by her treating physicians. In support, she cites *Lang v. Long-Term Disability Plan of Sponsor Applied Remote Tech., Inc.*, 125 F.3d 794 (9th Cir. 1997), a case that she maintains criticizes Standard's reliance on the opinions proferred by Dr. Fraback. Her reliance is misplaced.

In *Lang*, Dr. Fraback opined that the claimant's fibromyalgia diagnosis was not clear because her treating physician failed to identify the required number of trigger points. *Id.* at 797. On the basis of this report, Standard denied the claimant's request to remove a limitation from her claim for benefits. *Id.* Standard subsequently conceded, however, that she suffered from the condition, yet, continued to deny her claim. *Id.* The court found that, despite Dr. Fraback's opinion to the contrary, there was "clear evidence" from the claimant's treating physician that she suffered from fibromyalgia, and held that the claimant had made a sufficient showing of the plan's self-interest. *Id.* at 798-99. The case, however, is readily distinguishable from the case at bar.

It is indeed true that Plaintiff's treating physician, specifically, Dr. Hirsen, opined on March 13, 2008, that Plaintiff's rheumatoid arthritis precluded her from ever returning to work (Dr. Itkin, another one of her physicians, stated that her neurological condition would not prevent her from working). However, the Court cannot say that Plaintiff has presented "clear evidence" that this statement is accurate. Indeed, though Dr. Hirsen made this assertion, he did so despite having released her to return to work, without restrictions, on January 28, 2008. And without having examined her since January 21, 2008.

Nor do the records from subsequent visits provide clear evidence. To be sure, a review of documentation reveals that Plaintiff's arthritis was fairly well controlled. For example, though Ms. Ball was experiencing increased joint pain when she visited him on March 24, 2008, she informed Dr. Hirsen that she had missed a week of her Methotrexate, medication that Dr. Hirsen believed controlled her arthritis. And despite her complaints of pain, Dr. Hirsen was unable to see any joint inflammation. Overall, he said, Plaintiff's clinical examination was good. This sentiment was echoed when Dr. Hirsen saw Ms. Ball on September 9 and September 11, 2008. During those visits, her arthritis was said to be under control and an examination failed to reveal evidence of joint inflammation. Similar views were expressed following her visit on September 25, 2008.

21

Because the Court cannot say that Dr. Fraback's opinion that Ms. Ball is able to work is contrary to clear evidence presented by Dr. Hirsen, this is not sufficient grounds by which to justify limited discovery.[3]

## 2.    Standard's Job Description

Ms. Ball maintains that Standard's job descriptions for its disability benefits supervisor and analyst are prima facie evidence of bias and motive and, thus, justify limited discovery. The Court disagrees.

The job descriptions for Standard's disability benefits analyst and supervisor provide, inter alia, that appropriately containing claim liability is an essential job function. Plaintiff argues that "[t]his . . . encourages claims employees to deny claims in order to reduce the company's liability and increase profitability." The Court disagrees that this mandate provides sufficient grounds to warrant discovery. Indeed, the court in Garvey, 264 F.R.D. at 399 n.1, rejected this same argument and held that "[c]laims containment is presumably a general goal of all insurance companies and their staff." This by itself, therefore, is not enough.

Nor is the Court inclined to allow discovery based on the fact that the job descriptions contain financial information

---

[3]    Additionally, the Court is not convinced by Plaintiff's contention that Dr. Fraback "systematically rejects opinions of treating physicians," considering she has directed the Court's attention to, at most, two instances.

pertaining to the jobs' annual impact, single payment limits, and reserve authority. This Court, as did the court in *Garvey v. Piper Rudnick LLP Long Term Disability Ins. Plan*, No. 08 C 1093, 2009 U.S. Dist. LEXIS 114229, at *7 (N.D. Ill. Dec. 8, 2009), has "serious doubts" about Plaintiff's theory that this indicates Standard's failure to wall off its claims administrators from those concerned with the firm's finances. To be sure, the description states that each analyst has between 100-110 disability claims at any given time; the supervisor's description indicates that the entire section manages approximately 2,500. These figures do not account for claims that are denied, rather, they reflect only those that are active. The Court is not convinced that the average analyst or supervisor, even ponders the direct impact, let alone the indirect one, when considering each individual claim. Nor can they really. While they may have sufficient knowledge of past and current claims (those denied and active) to make some use of the annual impact figures, for example, they know nothing of the claims that are forthcoming. It seems unlikely, then, that they can use this information in any meaningful way in their determinations to award or deny benefits. Nor does the fact that employees are made aware of their financial authority do anything to show that they are "incentivized to deny claims to show their superior 'claims containment' and ability to earn profits for the company," especially in light of Standard's directive that they "accurately

determine eligibility for, and entitlement to disability
benefits."

The job descriptions, therefore, fail to make an adequate
showing of good cause.

### 3. Dr. Leonid Topper's Review

Plaintiff contends that Dr. Topper's opinion that she is
able to work provides good cause for the Court to allow limited
discovery in this case, as he has previously been criticized for
providing opinions outside his expertise. In support of this
contention, she relies on *Finley v. Hartford Life & Accident Ins.
Co.*, No. C 06-06247 CW, 2009 U.S. Dist. LEXIS 105516 (N.D. Cal.
Oct. 26, 2009). This argument is disingenuous at best, and
merits very little discussion. In *Finley*, the issue was whether
the claimant suffered from ankylosing spondylitis, a form of
arthritis. *Id.* at *2-17. When requested by the benefit plan to
discuss the claimant's functional ability, Dr. Topper provided
his beliefs regarding her neurological conditions, but declined
to opine on the spondylitis, stating, "the functionality related
to this condition is beyond the scope of this neurological review
and is deferred to the rheumatology [sic]." *Id.* at *15 (quoting
AR 1107). As he chose to defer to a rheumatologist, it is not
possible that he, as Plaintiff contends, was "criticized by the
court for providing opinions on conditions outside his
expertise." Further, it is obvious that, even if he had opined

on the rheumatological condition in that case, it is irrelevant to the instant matter because here he opined, as a *neurologist*, not on Plaintiff's rheumatoid arthritis, but on her *neurological* conditions. This argument clearly fails to provide any basis for the allowance of discovery beyond the administrative record.

## CONCLUSION

For the reasons set forth above, the Court grants Defendants' Motion *In Limine* for a Declaration of the Standard of Review and for a Protective Order. The Court's review of the denial of benefits herein will be limited to the Administrative Record. Therefore, Plaintiff's discovery requests are stricken.

Date: May 17, 2010        E N T E R E D:


MAGISTRATE JUDGE ARLANDER KEYS
UNITED STATES DISTRICT COURT