UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SUSAN H. BALL | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 09 C 3668 |
| | ) |
| v. | ) Magistrate Judge |
| | ) Arlander Keys |
| | ) |
| STANDARD INSURANCE COMPANY and | ) |
| GROUP LONG TERM DISABILITY | ) |
| INSURANCE POLICY | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

Currently before the Court is Standard Insurance Company's and the ERISA Plan's Motion for Entry of Judgment [103]. For the following reasons, Standard Insurance Company's and the ERISA Plan's Motion for Entry of Judgment [103] is granted.

**Background and Procedural History**

The facts of this case are fully set forth in the Court's May 17, 2010 Memorandum Opinion and Order. *See Ball v. Standard. Ins. Co.*, No. 09 C 3668, 2010 WL 2024082, at *1-7 (N.D. Ill. May 17, 2010). To summarize, Ms. Ball worked as a legal secretary at the law firm of Crisham & Kubes, Ltd. ("Crisham") until February 20, 2008, when her employment was terminated. Crisham provided its employees with disability insurance coverage under a Group

Long Term Disability Insurance Policy ("Group Policy") issued by Standard Insurance Company ("Standard"). The Group Policy is an employee welfare benefit plan ("Plan") governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. §1001 et seq. ("ERISA").

In 2001, Ms. Ball was diagnosed with rheumatoid arthritis, an inflammatory condition characterized by episodic flares and lengthy remissions. Her arthritis remained well controlled with medications, and she continued to work full time as a legal secretary. A flare-up of her rheumatoid arthritis caused her to stop working at the firm on January 4, 2008, (Def.'s App. STND 1451-00346, 00487). Her rheumatologist, Dr. Daniel J. Hirsen (Hirsen), advised that she not work on January 7 and January 8 because of her condition. (Def.'s App. STND 1451-00349). She was permitted to, and did, return to work without any restrictions on January 9. (Def.'s App. STND 1451-00349, 00509). After another flare-up, however, Dr. Hirsen again directed Ms. Ball to remain home from work, this time from January 10 until she was re-evaluated on January 21. (Def.'s App. STND 1451-00348). She was released to return to work on January 28, and worked four more days before being terminated on February 20. (Def.'s App. STND 1451-00347, 00487, 00503, 00507-08). When Ms. Ball's employment terminated, her coverage under Crisham's disability insurance Plan ended.

On March 24, 2008, a month after her employment and coverage was terminated, Ms. Ball filed for long-term disability benefits. (Def.'s App. STND 1451-00487). She indicated that rheumatoid arthritis had rendered her disabled since January 7, 2008; specifically stating that "stiffness [and] swollen joints" and her inability to "sit or stand for periods of time" precluded her from working. (Id.) Her claim was denied on May 30, 2008, for failing to submit sufficient medical documentation to demonstrate that she had remained continuously disabled throughout the 90-day benefit waiting period (BWP), which if commenced on January 7th, concluded in April of 2008[1]. (Def.'s App. STND 1451-00452-54). On December 23, 2008, Ms. Ball appealed Standard's decision denying her claim, asserting several additional medical conditions. The denial was affirmed, however, on March 20, 2009. (Def.'s App. STND 1451-00362, 00411).

Ms. Ball, having exhausted the internal appeal procedures at Standard, brought the present action seeking relief under ERISA. On May 17, 2010, the Court determined that the Plan's denial of Plaintiff's application for benefits would be reviewed under the *de novo* standard. Notwithstanding a *de novo* review given to both the factual and legal issues herein, the Court, nonetheless, finds no genuine issue as to any material fact regarding

---

[1] There are discrepancies within the record concerning the date on which the BWP ended. At least one document says April 10, while another says April 11, 2008. ( Compare Def.'s App. STND 1451-00374 with Def.'s App. STND 1451-00454). This is of no consequence, however, to the Court's analysis.

3

Standard's denial, and that Standard is entitled to judgment as a matter of law under Fed. R. Civ. P. 52(a). Thus, Ms. Ball's cross-motion is denied as she is not entitled to the benefits sought under the Plan.

### Standard of Review

Per the Court's May 17, 2010 Memorandum Opinion and Order, the *de novo* standard of review applies. *Ball v. Standard. Ins. Co.*, No. 09 C 3668, 2010 WL 2024082 (N.D. Ill. May 17, 2010). "[T]he *de novo* standard requires the Court to review the case with a fresh eye. In fact, the Court is not technically 'reviewing' any decision, but rather making its own independent determination about the merits of the dispute and the employees entitlement to benefits." *Young v. Verizon's Bell Atl. Cash Balance Plan*, 667 F. Supp. 2d 850, 889 (N.D. Ill. 2009)(quoting *Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 643 (7th Cir. 2007)). In other words,

> [W]hen *de novo* consideration is appropriate in an ERISA case . . . the court can and must come to an independent decision on both the legal and factual issues that form the basis of the claim. What happened before the Plan administrator or ERISA fiduciary is irrelevant. [citation omitted]. That means that the question before the district court . . . was the ultimate question whether [Plaintiff] was entitled to the benefits [she] sought under the Plan.

*Id.*

Ms. Ball bears the burden of proving, by a preponderance of the evidence, that she satisfied the Plan's conditions for obtaining benefits. See Ruttenburg v. U.S. Life Ins. Co., 413 F.3d 652, 663 (7th Cir. 2005). Ms. Ball filed a disability claim with Standard on March 24, 2008, claiming to be disabled since January 7, 2008 due to rheumatoid arthritis and entitled to long term disability benefits. The "Own Occupation Definition of Disability" provides:

> During the Benefit Waiting Period and the Own Occupation Period you are required to be Disabled only from your Own Occupation. You are Disabled from your Own Occupation if, as a result of Physical Disease, Injury, Pregnancy or Mental Disorder, you are unable to perform with reasonable continuity the Material Duties of your Own Occupation.

Doc 19-1, AR 00012

The Policy defines "Benefit Waiting Period" as follows:

> Benefit Waiting Period means the period you must be continuously Disabled before LTD benefits become payable. No LTD benefits are payable for the Benefit Waiting Period."

Doc 19-1, AR 00029

The Policy states that the Benefit Waiting period is 90 days. (Doc 19-1, AR 00007.)

The above terms of the Plan are uncontested. Ms. Ball contends that she provided substantial, salient evidence supporting her claim that she could not perform with reasonable continuity the Material Duties of her Own Occupation, and that she fulfilled the BWP by being continuously Disabled since

5

January 7, 2008. The main discrepancy herein lies in the contrast of the Plan's definition versus Plaintiff's interpretation of what performing with "reasonable continuity the Material Duties of [her] Own Occupation" means, as well as what being "continuously Disabled" for 90 days entails.

Plaintiff argues that Defendants are mistakenly maintaining that "proving continuous Disability means proving *constant* experience of symptoms limiting functionality." (Pl.'s Resp. 2,[116])(emphasis added) Ms. Ball asserts that there is no evidence in the Plan supporting the interpretation that *constant* disabling symptoms are required to satisfy the Plan's definition of Disability. Id. The Court finds no evidence of Defendants insertion of the supposed requirement of *constant* symptoms within the definition of the Plan terms. Although, Plaintiff's interpretation of the terms of the Plan are misplaced, the law relied upon is spot on.

Plaintiff directs the Court to *Santaella v. Metropolitan Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997), explaining that the courts must "interpret the terms of the policy in an ordinary and popular sense, as would a person of average intelligence and experience, and construe all ambiguities in favor of the insured. Plan language may only be deemed ambiguous where it is subject to more than one reasonable interpretation." (citations and quotations omitted.) Indeed, because this insurance plan was

established under ERISA, federal common law rules of contract interpretation govern the disposition of this case. *Life Ins. Co. of North America v. Von Valtier*, 116 F.3d 279, 283 (7th Cir. 1997). However, the Court finds the Plan's definition to determine Disability to be unambiguous. It reads that one must be "unable to perform with reasonable continuity the Material Duties of [her] Own Occupation." STND 1451-00012-13 The Court finds that construing the term "unable to perform with reasonable continuity" according to an "ordinary and popular sense" means that if there is at least some reasonable continuity of one's job performance, then one is not Disabled as defined under the Plan. With these principles in mind, the Court begins its *de novo* review of the uncontested facts.

**Facts**

**I. Ms. Balls' Disability Claim**

On March 24, 2008, more than one month after her termination from Crisham, Ms. Ball submitted a disability claim form to Standard. (Defendants' Proposed Findings of Fact, ("PFF") ¶ 34). She claimed disability since January 7, 2008 due to rheumatoid arthritis. On her disability claim form, in response to the question "How does your disability prevent you from working?" Ms. Ball wrote, "stiffness, swollen joints, unable to sit or stand for periods of time." (PFF ¶ 32). Her rheumatologist, Dr. Hirsen, signed an Attending Physician's Statement ("APS") dated March 13,

2008, describing Ms. Ball's symptoms as "painful swollen stiff joints" and her functional status as extremely impaired. (PFF ¶ 33). According to Dr. Hirsen's APS form, Ms. Ball was unable to sit, stand, walk, or alternately sit and stand for more than one hour each day. (PFF ¶ 33). Standard obtained Ms. Ball's job description from Crisham and consulted a vocational counselor, Phil Hines, CPDM, to identify the functional requirements of Ms. Ball's Own Occupation. (PFF ¶ 36). Mr. Hines determined that Ms. Ball's Own Occupation corresponds to the occupational profile of a legal secretary as described in the Department of Labor's Dictionary of Occupational Titles, which is a sedentary occupation. (PFF ¶ 36). Based on Ms. Ball's claim that she became disabled on January 7, 2008, Standard calculated that the 90-day Benefit Waiting Period ended on April 11, 2008. (PFF ¶ 61).[2]

## II. Ms. Ball's Treatment for Rheumatoid Arthritis

Since at least 2001, Plaintiff has had rheumatoid arthritis. Her treatment includes exercise and stretching to maintain strength and flexibility, anti-inflammatory medication, and anti-rheumatic medication such as Remicade, and methotrexate to place the disease in remission. On January 8, 2008, Dr. Hirsen excused

---

[2]Because Ms. Ball worked several full or part-time days in both January and February 2008, the Benefit Waiting Period was extended. Although discrepancies within the record concerning the date on which the BWP ended, either April 10 or April 11, 2008, this is of no consequence to the Court's analysis.

Ms. Ball from work on January 7th and 8th "due to arthritis flare up." Dr. Hirsen noted that Ms. Ball could "return to work - no restrictions" on January 9, 2008. (PFF ¶ 10). In a letter dated January 10, 2008, Dr. Hirsen extended Ms. Ball's medical leave to January 21, 2008. (PFF ¶ 11). Dr. Hirsen examined Ms. Ball on January 21, 2008 and noted her complaints of stress secondary to her job, and increased pain in her right elbow, right knee, right foot, and left buttock. Dr. Hirsen's spine exam was within normal limits, with no noted abnormalities, and no noted symptoms of pain, tenderness, swelling, or diminished range of motion in the joints of her wrist, hips, hands, and fingers (PIP and DIP joints). (PFF ¶ 12).

Based on his examinations, Dr. Hirsen released Ms. Ball to return to work starting Monday, January 28th ("Okay to return to work Mon. 1-28-08"). (PFF ¶ 12). Dr. Hirsen performed a follow-up exam on March 24, 2008 and noted that Ms. Ball experienced "somewhat increased generalized joint pain" after missing one week of methotrexate medication. (PFF ¶ 14). Dr. Hirsen opined that "the clinical exam looks good, with no evidence of joint inflammation," and recommended another exam in three months. (PFF ¶ 14). Ms. Ball did not see Dr. Hirsen until six months later, on September 11, 2008, when Dr. Hirsen performed a complete joint examination. Dr. Hirsen at that time found "no evidence of active joint inflammation," and opined that her rheumatoid arthritis was "stable" with "no complications" from treatment.

(PFF ¶ 15). On September 25, 2008, Dr. Hirsen opined that Ms. Ball's "clinical exam looks good without evidence of active inflammation." (PFF ¶ 15).

### III. Ms. Ball's Ischemic Stroke and Cervical Aneurysm

Shortly before Dr. Hirsen gave his release to return to work, Ms. Ball saw her internist, Dr. Joseph Kowalczyk, for complaints of occasional tinnitus and dizziness that she had "off and on" since October 2007. (PFF ¶ 16). On January 19, 2008, Dr. Kowalczyk noted that Ms. Ball's "arthritis isn't too bad." (PFF ¶ 17). He diagnosed her with hypertension and vertigo, and ordered an MRI of the brain. (PFF ¶ 17). The MRI, obtained on January 22, 2008, detected a possible cyst and nonspecific high signal lesion that the radiologist opined "may represent a chronic small vessel disease." (PFF ¶ 18). A repeat MRI obtained on January 27, 2008 showed a "benign" cyst and a "small to moderate acute infarct in the right pons not seen on the previous exam." (PFF ¶ 20). Dr. Kowalczyk referred Ms. Ball to Dr. Itkin, a neurologist, for further evaluation.

On January 29, 2008, Dr. Itkin reviewed the MRIs, examined Ms. Ball, and noted her self-reported history of vertigo, hypertension, and that "she clearly smokes." (PFF ¶ 21). Dr. Itkin found "no focal neurologic symptoms" and opined that his neurological exam "was entirely unremarkable." (PFF ¶ 21). Dr. Itkin obtained additional imaging studies, including an MRA on February 3, 2008 and a CTA of the head and neck on February 4,

10

2008. (PFF ¶ 23).

Dr. Kowalczyk referred Ms. Ball to a second neurologist, Dr. Demetrius Lopes, for further examination, including a cerebral angiogram performed on February 8, 2008. The angiogram detected a small aneurysm dilation measuring 3.5 cm by 0.8 cm in an artery in the neck near the base of the head (the cervical internal carotid artery or ICA). (PFF ¶ 25). The radiologist who performed the angiogram, Dr. Thomas Grobelny, found "no evidence of [a] clot within the lumen" and "no evidence" of acute dissection or leakage of the artery. (PFF ¶ 25). Dr. Grobelny opined that the aneurysm was "most likely a longstanding process" and concluded, "No intervention at the present time [is] necessary." (PFF ¶ 25).

Dr. Lopes examined Ms. Ball on February 14, 2008 and concurred with Dr. Grobelny's assessment. Dr. Lopes opined that the "vessel is functional" and the cervical aneurysm "does not seem to be hemodynamically significant at this point." (PFF ¶ 26). Dr. Lopes lectured Ms. Ball about her continued smoking. (Doc. 19-3, AR 00246).

Dr. Itkin performed a follow up examination of Ms. Ball on February 26, 2008. (PFF ¶ 30). Dr. Itkin opined that the "angiogram was negative except for diffuse aneurysm," and opined that the aneurysm was "not clinically relevant." (PFF ¶ 30). Dr. Itkin noted that Ms. Ball's "neurologic examination today is actually quite good." Dr. Itkin encouraged Ms. Ball to exercise

"and obviously control the smoking issue." (PFF ¶ 30). In a letter to Crisham dated February 15, 2008, Dr. Kowalczyk released Ms. Ball to return to work starting February 18, 2008. (PFF ¶ 28).

Although Ms. Ball seeks to include numerous additional medical conditions that became symptomatic in August and September of 2008, her efforts are futile as she admits she was terminated on February 20, 2008 and that, when her employment terminated, her coverage under Crisham's disability insurance Plan ended, as well. The Group Policy specifies that disability must begin while still insured under the insurance plan, and that no benefits are payable unless the insured was continuously disabled throughout the 90-day BWP. Ms. Ball attempts to bolster her claim by underscoring later medical issues, including her hand surgeon's diagnosis of carpal tunnel syndrome on August 14, 2008 as well as the fact that she underwent cardiac bypass surgery on September 12, 2008. (Pl.'s Resp. 3-4,[116]) However, none of these issues are applicable to her instant claim for disability. If the conditions did not commence while she was still employed (i.e. insured) and did not last throughout the 90-day BWP, it is irrelevant. Therefore, the Court will not elaborate further on such inapplicable evidence.

## Analysis

Ms. Ball contends that based on the medical evidence above, she is Disabled from her Own Occupation, as she cannot perform

the material duties of a legal secretary, including the basic material duty of prolonged sitting, and that she was continuously disabled for the entirety of the 90-day BWP. However, the overwhelming majority of medical evidence refutes Ms. Ball's claim that she was continuously disabled from January 7, 2008 through April of 2008, specifically the fact that she was repeatedly released by each of her treating physicians to return to work during the BWP, with no restrictions.

Ms. Ball was released to return to work by her treating rheumatologist, Dr. Hirsen, starting January 28, 2008. When Dr. Hirsen examined Ms. Ball on March 24, 2008, he opined that her "clinical exam looks good, with no evidence of joint inflammation." What is peculiar, however, is that on an APS dated March 13, 2008, Dr. Hirsen represented to Standard that Ms. Ball was extremely impaired and unable to sit, stand, or walk for more than one hour per day. When he signed that APS, Dr. Hirsen had not examined Ms. Ball since January 21, 2008, when he released her to return to work starting January 28th. Even considering this outlier assessment, Dr. Hirsen's contemporaneous medical records nonetheless refute Ms. Ball's claim that she was continuously disabled from January 7, 2008 through the end of the BWP.

Dr. Hirsen did not examine Ms. Ball again until September 11, 2008, at which time he found "no evidence of active joint inflammation." Ms. Ball was not disabled by painful, swollen

13

joints, and unable to sit, stand, or walk for more than one hour per day. No physician opined that Ms. Ball's ischemic stroke or carotid aneurysm were disabling. Instead, every neurologist who examined Ms. Ball concluded that she had no residual symptoms from her ischemic stroke or cervical carotid aneurysm. In fact, her primary treating neurologist, Dr. Itkin, expressly opined that Ms. Ball's neurologic conditions would not prevent her from working as a legal secretary.

Standard consulted two Board certified rheumatologists, Dr. Ronald Fraback and Dr. Dorothy Nicholson, who evaluated the medical records, considered the functional requirements of a legal secretary, and concluded that Ms. Ball was not disabled by rheumatoid arthritis after she was released to return to work on January 28, 2008. Standard additionally consulted a Board certified neurologist, Dr. Leonid Topper, who also evaluated the medical records, considered the functional requirements of a legal secretary, and spoke directly with Dr. Itkin. Dr. Topper concluded that Ms. Ball's neurologic condition was not disabling during the Benefit Waiting Period or thereafter, consistent with the opinions of Ms. Ball's treating neurologists, Drs. Itkin and Lopes.

Ms. Ball argues that Defendants fail to consider the symptoms and side effects of her medications, which "individually preclude Plaintiff from performing the highly skilled tasks of her own occupation as a legal secretary." (Pl.'s Resp. 4,[116]).

14

Although Defendants may have had evidence that Plaintiff's medications such as Remicade, Methotrexate, Lisinoril, Topamax, dyzadie and diltiazem create side effects such as drowsiness, headaches, nausea, etc., that alone, or even in concert with Plaintiff's diagnosis, does not provide sufficient evidence that Plaintiff cannot with reasonable continuity perform her Own Occupation. Ms. Ball has successfully coped with her RA since 2001, taking medications, experiencing side effects, and all the while managing to, "with reasonable continuity," perform her job as a legal secretary for many years.

Ms. Ball next argues that, because the Social Security Administration found her disabled and awarded her disability insurance benefits at the Reconsideration level, this Court should find that determination as probative evidence in consideration of her capacity for return to work. However, because only the Social Security Notice of Award is in the record, not the SSA's medical and vocational findings, the Court is provided with zero objective support for Ms. Ball's claim. *See Migliorisi v. Walgreens Disability Benefits Plan*, No. 06 C 3290, 2008 WL 904883, at *8 (N.D. Ill. Mar. 31, 2008)(finding the SSA's award of disability benefits unpersuasive under the *de novo* standard, where the Administrative Law Judge "did not identify any objective support for Migliorisi's claimed spondyloarthropathy.") Moreover, just as Plaintiff acknowledges

that a Social Security finding is not conclusive or binding on the insurer, it similarly is not binding on the court.

Finally, Plaintiff argues that, because Drs. Ronald Fraback, Leonid Topper, and Nicholson never examined her, as well as there being no evidence that they were provided the applicable definition of Disability, their findings should be given diminished weight. Ms. Ball's attempt to create a "treating physicians versus consulting physicians" debate is unavailing, as the most recent Seventh Circuit decision addressing Standard's disability determination, *Black, v. Long Term Disbaiity Ins.*, 582 F.3d 738 (7th Cir. 2009), held that Standard reasonably relied on the opinions of its consulting physicians over the contrary opinions of plaintiff's treating physicians. "Ultimately, Standard's consulting physicians presented thorough and reasonable explanations for their determinations, and Standard was permitted to give them credence." *Id.* at 746.

Unlike in *Black*, where the Seventh Circuit actually upheld the District Court's decision to give more credence to the consulting physicians, here both the treating and consulting physicians are in agreement that Ms. Ball was not disabled. No physician who either examined Ms. Ball or evaluated her medical evidence concluded that she was disabled during the BWP by a neurologic condition, a cardiac condition, or due to the side effects of her medications. And although Dr. Hirsen opined in

16

his March 13, 2008 APS form that Ms. Ball could not sit, stand, or walk for more than one hour a day, Dr. Hirsen had not examined Ms. Ball since January 21, 2008, when he released her to return to work without restrictions. Dr. Hirsen's medical records, conversely, establish that Ms. Ball was not continuously Disabled by her rheumatoid arthritic condition either.

Plaintiff lastly attempts to frame each of the physician's analysis as compartmentalized, failing to consider "the co-morbid effect" of her numerous impairments on her ability to function. (Pl.'s Resp. 9, [116]) However, this is not true, as the evidence reflects each doctor taking all of her symptoms into consideration as they each referred her to specialized doctors in order to investigate the totality of her claims and condition. Nonetheless, each physician agreed that, analysed either alone or in concert, nothing rendered her continuously Disabled.

Ms. Ball fails to meet her burden of proving, by a preponderance of the evidence, that she satisfied the Group Policy's definition of Disability from January 7, 2008, through the end of the 90-day Benefit Waiting Period in early April of 2008. Even if the Court takes into consideration the earliest possible onset date of her disability, the Court cannot conclude that Ms. Ball was continuously disabled from that date throughout the entirety of the following 90-days, given that her treating physicians allowed her, time and time again, to return to work without restriction in both January and February of 2008.

Although she was advised not to work for several days in both January and February, the fact that she was eventually released by each physician to return to her sedentary job is evidence that she was able to "perform with reasonable continuity the Material Duties of her Own Occupation." Accordingly, the Court enters judgment in favor of Standard and the Plan. However, the Court denies Defendants' request of an award of costs and attorneys' fees incurred in this action under 29 U.S.C. §1132(g).

## CONCLUSION

For the reasons set forth above Defendants' Motion for Entry of Judgment [103] is GRANTED, and this case is DISMISSED.

Date: June 7, 2012                    E N T E R E D:


*Arlander Keys*
MAGISTRATE JUDGE ARLANDER KEYS
UNITED STATES DISTRICT COURT